# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
SUNDAY IYOHA,                                    )
                                                 )
                Plaintiff,                       )
                                                 )
        v.                                       )        Civil Action No. 15-324 (RBW)
                                                 )
ARCHITECT OF THE CAPITOL,                        )
                                                 )
                Defendant.                       )
_____)

## <u>MEMORANDUM OPINION</u>

The plaintiff, Sunday Iyoha, brings this civil action against the defendant, the Architect of

the Capitol (the "Architect"), asserting claims of discrimination, retaliation, and hostile work

environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2 to -7

(2012) ("Title VII"), as applied to Congressional agencies like the Architect through the

Congressional Accountability Act, 2 U.S.C. § 1408 (2012). <u>See</u> Complaint ("Compl.") ¶¶ 1, 52–

58. Specifically, the plaintiff alleges that the Architect unlawfully discriminated against him on

the basis of his race and national origin and retaliated against him for engaging in prior protected

activity by not selecting him for a supervisor position on two separate occasions. <u>See</u> <u>id.</u> ¶¶ 42–

50; <u>see also</u> Supplemental Complaint Pursuant to Rule 15(d) ("Suppl. Compl.") ¶¶ 10–20.

Currently before the Court are the Defendant's Motion for Summary Judgment ("Def.'s Mot.")

and the Plaintiff's Motion for Oral Argument on Defendant's Motion for Summary Judgment or

for Leave to File a Sur[-]reply ("Pl.'s Mot."). Upon careful consideration of the parties'

submissions,[1] the Court concludes for the reasons set forth below that it must deny the plaintiff's

---

[1] In addition to the filings previously identified, the Court considered the following submissions in reaching its
decision: (1) the defendant's Memorandum of Points & Authorities in Support of Defendant's Motion for Summary
(continued . . .)

motion for oral argument and grant the defendant's motion for summary judgment.

## I.    BACKGROUND

The plaintiff, who "is black and of Nigerian descent," Compl. at 1, is a current employee of the Architect in the Project Management Branch of the Information Technology Department (the "Department"), see id. ¶¶ 4, 8, 22, which, during the relevant time frame, "was led by Chief Information Officer Jay Wiegmann," Def.'s Mem. at 2, and Angela Clark, the Deputy Chief Information Officer, see id. Between 2008 and October 4, 2012, the plaintiff worked as an Information Technology Help Desk Manager, see Compl. ¶ 8; see also Pl.'s Facts ¶ 1, and on October 5, 2012, Wiegmann and Clark reassigned the plaintiff "to a Project Management [p]osition under the Project Management Branch," Pl.'s Facts ¶¶ 12, 14, as part of a "reorganiz[ation of] the Help Desk and other IT support functions," Compl. ¶ 19. As a result of this reassignment, and because of various discriminatory remarks purportedly made by Wiegmann and Clark, see Pl.'s Facts ¶¶ 12–18, 25–48 (discussing negative remarks about individuals who speak with accents such as the plaintiff), the plaintiff, in February 2013, filed a complaint with the Office of Compliance, primarily challenging his reassignment, see Compl. ¶ 27; see also Pl.'s Facts ¶ 15.

On June 7, 2013, a hearing officer "conclude[d] that [the] plaintiff [was] entitled to judgment on [his] claim of discrimination based on national origin resulting" from the Help Desk Manager position. Pl.'s Opp'n, Exhibit ("Ex.") 8 (Office of Compliance Final Order ("OOC

---

(. . . continued)

Judgment ("Def.'s Mem."); (2) the Defendant's Statement of Material Facts as to Which There Is No Genuine Issue ("Def.'s Facts"); (3) the Plaintiff's Opposition to Summary Judgment ("Pl.'s Opp'n"); (4) the Corrected Plaintiff's Local Rule 7(h)(1) Statement of Material Facts Showing Genuine Issues Necessary to Be Litigated ("Pl.'s Facts"); (5) the Plaintiff's Local Rule 7(h)(1) Response to Defendant's Statement of Material Facts to Which Defendant Claim[]s There Is No Genuine Issue ("Pl.'s Resp."); (6) the Reply in Support of Defendant's Motion for Summary Judgment ("Def.'s Reply"); (7) the Defendant's Opposition to Plaintiff's Motion for Oral Argument or for Leave to File a Sur-reply ("Def.'s Opp'n"); and (8) the Reply to Plaintiff's Motion for Oral Argument or, in the Alternative, for Leave to File a Sur-reply ("Pl.'s Reply").

Final Order")) at 2. Specifically, the hearing officer concluded that the record indicated that the reorganization "was [not] an established plan at all, other than to move those with foreign accents to less customer-facing positions." Id., Ex. 8 (OOC Final Order) at 30 (footnote omitted); see also id., Ex. 8 (OOC Final Order) at 26 (noting that several witnesses "testified that they heard Wiegmann repeatedly make disparaging comments aloud in meetings criticizing employees with foreign accents"). Based on this finding, the hearing officer awarded the plaintiff $30,000 in compensatory damages. See id., Ex. 8 (OOC Final Order) at 37. On July 30, 2014, upon the Architect's petition for a review of the hearing officer's decision, the Board of Directors of the Office of Compliance "affirm[ed] the [h]earing [o]fficer's finding of national origin discrimination." Id., Ex. 21 (Office of Compliance Decision of the Board of Directors ("BOD Decision")) at 1.

Subsequently, in 2014, the plaintiff applied and interviewed for the Branch Chief position in the Department's Production Management Branch. See Def.'s Facts ¶ 2; see also Pl.'s Resp. ¶ 2 (not disputing this fact). This Branch Chief was "responsible for [Architect]-wide support of server and network infrastructure as well as desktop and mobile endpoints, including evaluating and introducing new hardware, software, and technologies." Pl.'s Opp'n, Ex. 46 (Vacancy Announcement) at 3 (listing primary duties). Clark was the selecting official for the position, and she designated herself, Wiegmann, Peggy Hernandez, and Luis Rosario as panelists who would participate in the interview process. See Pl.'s Facts ¶¶ 105–08. The plaintiff was not selected for this position, see Def.'s Facts ¶ 3; see also Pl.'s Resp. ¶ 3 (not disputing this fact); rather, Clark selected Teddy Tseng, who "is Taiwanese and speaks with an accent," Def.'s Facts ¶ 4; see also Pl.'s Resp. ¶ 4 (noting that Tseng "comes from [ ] Taiwan" and not disputing that he speaks with an accent). In 2015, the plaintiff applied and interviewed again for the same

position.  See Def.'s Facts ¶ 8; see also Pl.'s Resp. ¶ 8 (not disputing this fact).  For this

selection, Clark remained the selecting official, but she divided the interview process into two

rounds.  See Def.'s Facts ¶ 9; see also Pl.'s Resp. ¶ 9(h) (not disputing this fact).  Clark

designated herself, Hernandez, Billy Louis, Lynn Marino, and Gus Kotting as the panelists for

the first round of interviews.  See Def.'s Facts ¶ 9; Pl.'s Resp. ¶¶ 8–9 (not disputing these facts).

The plaintiff was not selected to proceed to the second round of interviews because each of the

panelists scored him lower than the top three candidates, one of whom spoke with an accent.  See

Def.'s Facts ¶¶ 9–10; see also Pl.'s Resp. ¶¶ 9–10 (not disputing these facts).

On March 5, 2015, the plaintiff filed this civil action, asserting that the Architect denied

him the Branch Chief position in 2014 "because of his race, national origin[,] and/or prior

protected activity," Compl. ¶ 53, and that Wiegmann's and Clark's alleged discriminatory

conduct constituted a hostile work environment, id. ¶ 57.  Thereafter, the plaintiff filed a

Supplemental Complaint, alleging the same claims based on his second non-selection by the

Architect in 2015.  See generally Suppl. Compl.  At a post-discovery status conference held on

November 2, 2016, the plaintiff orally requested to voluntarily dismiss without prejudice his

claims of discrimination on the basis of his race and hostile work environment as alleged in his

Complaint, which the Court granted.  See Min. Order (Nov. 3, 2016).  The Architect then moved

for summary judgment on the grounds that the plaintiff "does not have sufficient countervailing

evidence of [national origin] discrimination or retaliation to require a trial," and therefore,

"summary judgment in its favor" is warranted.  Def.'s Mem. at 1.  The plaintiff opposes the

Architect's motion, and after briefing on the Architect's motion was complete, the plaintiff filed

a Motion for Oral Argument on Defendant's Motion for Summary Judgment or for Leave to File

a Sur[-]reply.  See generally Pl.'s Mot.  This opinion resolves these motions.

## II.    STANDARDS OF REVIEW

### A.    Motion for Oral Argument/Leave to File a Sur-reply

It is within the "sole discretion of the [C]ourt" whether to allow an oral argument on a motion for summary judgment.  Spark v. Catholic Univ. of Am., 510 F.2d 1277, 1280 (D.C. Cir. 1975); see LCvR7(f).  Generally, a court will grant a motion for oral argument only if it requires further evidence or extrapolation to reach a decision on the issue before it.  See Spark, 510 F.2d at 1280 (finding that granting the plaintiff's motion for oral argument would not have "produced any further evidence to enable the District Court to find federal jurisdiction").

Furthermore, a court will grant a motion for leave to file a sur-reply if "the party making the motion would be unable to contest matters presented to the court for the first time in the opposing party's reply."  Lewis v. Rumsfeld, 154 F. Supp. 2d 56, 61 (D.D.C. 2001); see also Ben-Kotel v. Howard Univ., 319 F.3d 532, 536 (D.C. Cir. 2003).  In any event, although "sur[-]replies are generally disfavored," Kifafi v. Hilton Hotels Ret. Plan, 736 F. Supp. 2d 64, 69 (D.D.C. 2010), aff'd, 701 F.3d 718 (D.C. Cir. 2012), "[t]he decision to grant or deny leave to file a sur-reply is committed to the sound discretion of the Court," Lu v. Lezell, 45 F. Supp. 3d 86, 91 (D.D.C. 2014).  If new arguments appear for the first time in a movant's reply, granting leave to file a sur-reply is appropriate.  See Flynn v. Veazey Constr. Corp., 310 F. Supp. 2d 186, 189 (D.D.C. 2004).  But, such arguments "must be truly new."  United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc., 238 F. Supp. 2d 270, 277 (D.D.C. 2002).  "Simply put, a sur[-]reply is not a vehicle for rehashing arguments that have already been raised and briefed by the parties.  Were that not true, briefing would become an endless pursuit."  Crummey v. Soc. Sec. Admin., 794 F. Supp. 2d 46, 63 (D.D.C. 2011), aff'd, No. 11-5231, 2012 WL 556317 (D.C. Cir. Feb. 6, 2012).

**B.      Motion for Summary Judgment**

Before granting a motion for summary judgment pursuant to Federal Rule of Civil

Produce 56, a court must find that "there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is material if it

'might affect the outcome of the suit under the governing law,' and a dispute about a material

fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party.'"  Steele v. Schafer, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to

be believed, and all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at

255 (citation omitted).  "Credibility determinations, the weighing of the evidence, and the

drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling

on a motion for summary judgment . . . ."  Id.  The movant has the burden of demonstrating the

absence of a genuine issue of material fact and that the non-moving party "fail[ed] to make a

showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317,

322 (1986).

In responding to a summary judgment motion, the non-moving party "must do more than

simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Accordingly, the non-moving party

must not rely on "mere allegations or denials[,] . . . but . . . must set forth specific facts showing

that there [are] genuine issue[s] for trial."  Anderson, 477 U.S. at 248 (second omission in

original) (citation and internal quotation marks omitted).  Moreover, "[t]he mere existence of a

scintilla of evidence in support of the [non-moving party's] position [is] insufficient" to withstand a motion for summary judgment, but rather "there must be [some] evidence on which the jury could reasonably find for the [non-movant]."  Id. at 252.

## III.    ANALYSIS

### A.    The Plaintiff's Request for Oral Argument or for Leave to File a Sur-reply

The plaintiff "request[s] oral argument to assist the Court in identifying the numerous instances in which the Architect," in its reply in support of its motion, "has either prompted the Court to apply inferences in its own favor, mischaracterized the record, or failed to respond to the substance of [his] factual and legal arguments."  Pl.'s Reply at 1 (asserting that oral argument would promote judicial economy).  However, the Court does not find that oral argument is warranted, as "[n]o showing has been made that an oral hearing would . . . produce[] any further evidence to enable the . . . Court to" resolve the Architect's motion for summary judgment.  Spark, 510 F.2d at 1280.  The plaintiff had ample opportunity, in the form of his opposition, to respond to the Architect's summary judgment motion and argue why the motion should not be granted.  And, the Court is able to resolve the motion based solely on the submissions already submitted to it, which the plaintiff acknowledges.  See Pl.'s Reply at 1 ("[The p]laintiff agrees that the Court is more than capable of identifying all of the deficiencies in the [Architect's] Reply Brief.").  Therefore, the Court denies this aspect of the plaintiff's motion for oral argument.

Moreover, in terms of filing a sur-reply, the plaintiff has not identified any issues that were raised for the first time in the Architect's reply.  See Robinson v. Detroit News, Inc., 211 F. Supp. 2d 101, 113 (D.D.C. 2002) (denying a motion for sur-reply "because the proposed sur[-]reply merely reiterate[d] arguments already made and [did] not add anything new").

Rather, the plaintiff requests leave to file a sur-reply due to the Architect's failure to respond to his statement of material facts and the Architect's reliance on "inferences applied in its favor." Pl.'s Mot. at 1. Additionally, the plaintiff "wishes to have the opportunity to address [the Architect's] misstatement of record evidence." Id. at 2. But, none of these reasons serve as a basis for granting a motion for leave to file a sur-reply. See Nix El v. Williams, 174 F. Supp. 3d 87, 92 (D.D.C. 2016) ("The purpose of a sur[-]reply is to enable the non-movant to contest matters presented for the first time in the opposing party's reply. A sur[-]reply may not be used simply to correct an 'alleged mischaracterization,' or to reiterate arguments already made." (citations omitted)). Thus, because the plaintiff fails to identify new issues raised in the Architect's reply, the Court denies the plaintiff's request for leave to file a sur-reply.

**B.      The Plaintiff's Title VII Claims**

**1.   Discrimination Based on National Origin**

Title VII protects federal employees from discrimination on the basis of national origin, in addition to other protected classes of federal employees. See 42 U.S.C. § 2000e–16(a) (2012). In the absence of direct evidence of discrimination, as is the situation here, claims of employment discrimination under Title VII are analyzed under the three-part framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Jackson v. Gonzales, 496 F.3d 703, 706 (D.C. Cir. 2007). Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination by providing proof of "(1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510 (2002) (citations omitted). If the plaintiff establishes a prima facie case, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory

reason for the [adverse employment action]." McDonnell Douglas, 411 U.S. at 802. However,

once the employer offers a legitimate, nondiscriminatory justification for its action,

"the McDonnell Douglas framework—with its presumptions and burdens—disappears, and the

sole remaining issue is discrimination vel non." Jackson, 496 F.3d at 707 (citation and quotation

marks omitted). Thus, after the employer makes such a showing, "the plaintiff must prove that a

reasonable jury could infer that the employer's given explanation was pretextual and that this

pretext shielded discriminatory motives." Id. (citation omitted).

Here, the Architect has asserted a legitimate, non-discriminatory reason for the plaintiff's

two non-selections: that the applicants selected "were independently determined to be better

qualified than [the plaintiff] by every panelist who interviewed them." Def.'s Mem. at 1; see id.

at 13–14 (showing tabulations of score sheet results for the plaintiff versus other candidates for

the 2014 non-selection); id. at 19–20 (showing a tabulation of score sheet results for the plaintiff

versus other candidates for the 2015 non-selection); see also Def.'s Mot., Ex. 24 (Collection of

Score Sheets for the selectee — Tseng (2014)); id., Ex. 25 (Collection of Score Sheets for the

plaintiff (2014)); id., Ex. 33 (Collection of Score Sheets for the plaintiff (2015)); id., Ex. 34

(Collection of Score Sheets for the selectee — Block (2015)). Thus, because the defendant has

asserted a legitimate, non-discriminatory reason for the plaintiff's non-selections, the Court must

determine if "the [plaintiff] [has] produced sufficient evidence for a reasonable jury to find that

the [defendant's] asserted non-discriminatory reason was not the actual reason and that the

[defendant] intentionally discriminated against the [plaintiff] on the basis of . . . [his] national

origin[.]" Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008). To make

this showing, the plaintiff may produce evidence in "any combination of (1) evidence

establishing [his] prima facie case; (2) evidence [he] presents to attack the employer's proffered

explanation for its actions; and (3) any further evidence of discrimination that may be available to [him], such as independent evidence of discriminatory statements or attitudes on the part of the employer." Holcomb v. Powell, 433 F.3d 889, 897 (D.C. Cir. 2006).

In this case, the plaintiff does not present evidence that he was more qualified than the candidates selected for the Branch Chief positions in either 2014 or 2015. See Pl.'s Opp'n at 21 n.5 ("The Architect argues that [the plaintiff] cannot show that he was substantially better qualified than the selected candidates, but [the plaintiff] is not attempting to prove his case under that route.") Rather, the plaintiff primarily presents evidence of discriminatory animus through disparaging remarks purportedly made by officials involved in the non-selection decisions, see id. at 12–21, and "evidence that the selection process was manipulated to avoid hiring him," id. at 21 n.5 (asserting that both selection processes were "inherently unfair to him"); see also Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1295 (D.C. Cir. 1998) ("A plaintiff attacking a qualifications-based explanation is of course not limited to comparing his qualifications against those of the successful candidate[s]. The plaintiff can instead seek to expose other flaws in the employer's explanation."). The plaintiff also alleges that the hiring of Tseng in 2014 and the advancement of one candidate who spoke with an accent in 2015 was a "ploy" to conceal discriminatory animus, see Pl.'s Opp'n at 41, and that there are adverse inferences that can be drawn against the Architect in his favor, see id. at 44. The Court will address in turn each of the plaintiff's proffers of evidence that, according to him, demonstrates that the Architect's qualifications-based explanation for his non-selections is pretext.

### a. Evidence of Discriminatory Animus Through Disparaging Remarks

Initially, to demonstrate that the Architect's qualifications-based explanations are not the true reasons for his non-selections in both 2014 and 2015, and that they were actually motivated

by discriminatory animus based on his national origin, the plaintiff identifies a number of disparaging remarks allegedly made by various officials involved in the non-selection decisions. See Pl.'s Opp'n at 13–21. Specifically, the plaintiff relies on comments purportedly made by Wiegmann, Clark, and Peggy Hernandez in 2012 regarding people with accents in the Department, specifically, "the need for people in the [Department] to speak clearly in English[,] and derogatory comments about people in the [Department] being from different countries." Id. at 13; see also id. at 15 (claiming that "three out of the four panelists from the first selection had made direct statements indicating their discriminatory animus against people who spoke with strong foreign accents"); id. at 16 (contending that two individuals in each interview round for the 2015 selection "had made direct statements of animus about people with accents"). The plaintiff also asserts that, in 2011, Wiegmann requested that the plaintiff refrain from giving him "in-person briefings on the Help Desk performance . . . because ([Wiegmann] claimed) he could not understand [the plaintiff] when [the plaintiff] spoke," id. at 13, and that Clark "stat[ed] that she would not have interviewed [the plaintiff] for the position (during either of the two selections) but for the fact that she was required to do so by [the Architect's] personnel rule," id. at 14.[2]

---

[2] The plaintiff asserts that these allegedly disparaging comments are direct evidence of national origin discrimination. See Pl.'s Opp'n at 13. However, "[t]he general rule is that 'stray remarks,' i.e., comments that are not tied to the alleged adverse employment action, 'might be probative of discrimination, but are not sufficient as direct evidence of discrimination.'" Harris v. Wackenhut Servs., Inc., 648 F. Supp. 2d 53, 62 (D.D.C. 2009) (quoting Isse v. Am. Univ., 540 F. Supp. 2d 9, 30 (D.D.C. 2008)). Therefore, because the majority of these comments were purportedly made two or three years prior to the challenged adverse employment actions and thus are not tied to those actions, they cannot serve as direct evidence of discrimination. Furthermore, although Clark's purported comment that she would not have interviewed the plaintiff had it not been for the Architect's policy has some relationship to the adverse employment actions, it also is not direct evidence of discrimination. The Court so concludes primarily because, contrary to the plaintiff's interpretation of Clark's comment, see Pl.'s Opp'n at 14, Clark represented that what she actually said was that she would not have interviewed the plaintiff based on what she knew about his experience and résumé and the skills she was looking for in a candidate such as "hands-on network administration experience, the background in network infrastructure, the management of the IT team experience, and operating systems, server management, [and] systems management." Pl.'s Opp'n, Ex. 2 (Clark's Deposition Transcript) at 139–40. All of which have nothing to do with the plaintiff's national origin. In any event,

(continued . . .)

11

A plaintiff may "avoid summary judgment by presenting . . . evidence, direct or circumstantial, that permits an inference of discrimination. Examples of such evidence include discriminatory statements by the employer, or other attitudes suggesting the decision maker harbors discriminatory animus." Holcomb, 433 F.3d at 899 (internal citations omitted). However, the alleged discriminatory statements cannot include mere "stray remarks" that have no bearing on the adverse action being challenged. Morris v. McCarthy, 825 F.3d 658, 669 (D.C. Cir. 2016) ("[I]solated [disparaging] remark[s] unrelated to the relevant employment decision [cannot], without more, permit a jury to infer discrimination."); see also Simms v. U.S. Gov't Printing Office, 87 F. Supp. 2d 7, 9 n.2 (D.D.C. 2000) ("'[S]tray remarks,' even those made by a supervisor, are insufficient to create a triable issue of discrimination where . . . they are unrelated to an employment decision involving the plaintiff."). Therefore, "[i]n order for [a p]laintiff to establish discriminatory animus in an adverse employment decision . . . there must be a clear nexus between the 'stray workplace remark[s]' and the adverse action[s]." Ajisefinni v. KPMG L.L.P., 17 F. Supp. 3d 28, 44 (D.D.C. 2014) (quoting Kalekiristos v. CTF Hotel Mgmt. Corp., 958 F. Supp. 641, 666 (D.D.C. 1997)). This nexus can be demonstrated "if the remark[s] w[ere] made by an individual with the power to influence [the p]laintiff's [non-selections], and the remark[s] w[ere] temporally close in time to the [non-selections]." Id.

For several reasons, the plaintiff's evidence of disparaging comments allegedly made by Wiegmann, Clark, and Hernandez in 2012, see Pl.'s Opp'n at 12–21, is not sufficient to show that the Architect's qualifications-based explanation is pretext or that the plaintiff's non-selections in 2014 and 2015 were actually motivated by discriminatory animus. Contrary to

---

(. . . continued)

Clark's comment does not "show[ ] a discriminatory motive on its face" or prove discrimination "without any need of an inference." Bhatnagar v. Sunrise Senior Living, Inc., 935 F. Supp. 2d 1, 6 (D.D.C. 2013) (quoting Davis v. Ashcroft, 355 F. Supp. 2d 330, 340 n.2 (D.D.C. 2005) (emphasis in original)).

the plaintiff's position, see Pl.'s Opp'n at 15, these alleged disparaging comments, accepted as true as required at this stage of litigation, see Anderson, 477 U.S. at 255, do not facially give rise to an inference of national original discrimination. Rather, these comments suggest that Wiegmann and Clark sought to address concerns regarding effective communication within the Department, which, as the Architect correctly notes, is a legitimate concern by an employer assessing a skill reasonably related to an employee's job performance.[3] See Def.'s Reply at 6 (citing cases); see also Fragante v. City & Cty. of Honolulu, 888 F.2d 591, 596–97 (9th Cir. 1989) ("An adverse employment decision may be predicated upon an individual's accent when— but only when—it interferes materially with job performance. There is nothing improper about an employer making an honest assessment of the oral communications skills of a candidate for a job when such skills are reasonably related to job performance." (emphasis in original) (citing Equal Employment Opportunity Commission ("EEOC") Compliance Manual (CCH) ¶ 4035 at 3877–78 (1986))).

In any event, the plaintiff mischaracterizes the contents of several of these alleged discriminatory comments to demonstrate ambiguity and what he perceives as discriminatory animus. For instance, the plaintiff states that "Lynn Marino testified that both Wiegmann and Clark made comments about people with accents in [the Department]" and that she "testified that she had conversations in which Wiegmann and Clark spoke about people who speak English as a

---

[3] At various points, the plaintiff asserts that "no . . . communications problems existed" in the Department. See, e.g., Pl.'s Opp'n at 13–14 (citing Pl.'s Facts ¶¶ 28–31). The Court is perplexed as to how this allegation has any merit, given that the plaintiff proffers to the Court as evidence of pretext several examples of Wiegmann making allegedly disparaging comments while addressing communication problems in the Department. See, e.g., Pl.'s Opp'n at 13 (discussing comments Wiegmann purportedly made at staff meetings regarding communication problems in the Department). Even so, in Marino's deposition, which the plaintiff cites as support for his position, she testified that she "was [not] aware of specific[] help desk communication problems," and that Wiegmann's comments were about "communicating clearly with customers." Id., Ex. 19 (Marino's Deposition Transcript) at 55–56; see also id., Ex. 19 (Marino's Deposition Transcript) at 53:20–54:21 (noting that she did not hear Wiegmann make comments "about people who speak with an accent" or about "people from different countries working on the help desk").

Second language in the [Department]."  Pl.'s Opp'n at 14 (citing to Pl.'s Facts ¶ 30).  However, according to Marino's deposition transcript, which the plaintiff cites for this proposition, Marino actually stated that she "remember[s] making the comment that . . . Wiegmann and . . . Clark were discussing communication problems among the [Department's] staff," and that she had "a discussion with the EEO investigators about the fact that there were people on the [Department's] staff who spoke English as a second language."  Id., Ex. 19 (Marino's Deposition Transcript) 73:2–74:8.  Additionally, the plaintiff contends that Clark joined in several of Wiegmann's "derogatory comments about people in [the Department] being from different countries."  Id. at 13 (citing Pl.'s Facts ¶¶ 24–37).  But, nothing in the record supports the allegation that Clark joined in any of the allegedly discriminatory comments purportedly made by Wiegmann.  See Pl.'s Facts ¶¶ 24–37.

Nonetheless, even if these allegedly discriminatory comments could be perceived as raising an inference of national origin discrimination, see Beaver v. McHugh, 840 F. Supp. 2d 161, 172 (D.D.C. 2012) ("It is certainly true that 'accent' and national origin are often intertwined, and the Court is cognizant of the fact that some unethical employers may attempt to conceal their discriminatory actions by referencing purported communication difficulties caused by an employee's accent as the 'official' reason for an adverse employment action." (citations omitted)), they nonetheless are not probative of discrimination in this case because they do not have "a clear nexus" to the plaintiff's challenged non-selections, Ajisefinni, 17 F. Supp. 3d at 44.  Although Clark was the ultimate decision-maker regarding the plaintiff's non-selections, Wiegmann and Hernandez served as interview panelists for both of the plaintiff's non-selections, and Clark relied upon their assessments of the interviewed candidates in making the selections.  See Pl.'s Facts ¶¶ 102–08, 144–45, 171.  Therefore, Wiegmann and Hernandez are "individuals

[who had] power to influence [the p]laintiff's [non-selections]." Ajisefinni, 17 F. Supp. 3d at 44. However, their alleged disparaging comments occurred two years before the plaintiff's first non-selection in 2014, see Pl.'s Facts ¶¶ 24–39, and given this significant gap in time between the alleged disparaging comments and the non-selections, it cannot be plausibly said, without more, that these alleged comments are related to the plaintiff's non-selections, see Wang v. Wash. Metro. Area Transit Auth., 206 F. Supp. 3d 46, 74 (D.D.C. 2016) ("Stray remarks lacking 'any temporal or substantive relationship' to the adverse employment action are not evidence of discriminatory intent." (emphasis in original) (quoting Francis v. Perez, 970 F. Supp. 2d 48, 65 (D.D.C. 2013))).  Instead, the comments appear to be related to the plaintiff's reassignment from the Department's Help Desk in 2012, which is not one of the adverse actions that the plaintiff challenges in this case.  See Pl.'s Opp'n at 16 (responding to the Architect's argument that the allegedly disparaging comments cited by the plaintiff are non-probative stray remarks by stating that "Clark and Wiegmann acted on their opinions by removing [the plaintiff] and others from their positions in the Production Management Branch"); see also id., Ex. 8 (OOC Final Decision) at 26–30 (stating that the testimony of credible witnesses regarding "disparaging comments" made by Wiegmann demonstrated evidence of discriminatory animus sufficient to create an inference of discrimination in the reassignment).

Despite acknowledging this lapse in time, the plaintiff contends that the "length of time is not fatal to [his] claim because Wiegmann engaged in similar discriminatory conduct in early 2014, when he embarrassed [the plaintiff] by testing his iPhone's voice recognition system on [the plaintiff], and then joked about it at a staff meeting," and because "Clark told Wiegmann that she would not have even interviewed [the plaintiff] for the 2014 selection had she not been required to do so by [Architect] regulations."  Id. at 18.  The plaintiff also argues that

because there was no discipline or training, and — based on their testimony — no moment of contrition [regarding their purported earlier conduct], the [Architect] cannot claim that Clark and Wiegmann had some intervening 'epiphany' moment between the time they ejected [him] from his Help Desk Manager position and the time of the selections at issue in the [C]omplaint.

Id.; see also id. at 18–19 ("[T]he Architect has produced no evidence or argument to suggest that bigotry only lasts two years." (emphasis in original)).  However, like the prior allegedly discriminatory comments, these comments do not either establish a nexus between the plaintiff's challenged adverse employment actions or create an inference of discrimination.  Regarding Wiegmann's purported testing of the iPhone's voice recognition system on the plaintiff, this action allegedly transpired several months prior to the first adverse employment action, see id., Ex. 3 (Iyoha Dep.) at 110:2–111:1 (noting that this incident occurred "[m]aybe 2014 early on"); see also id. at 7 (noting that Tseng was selected for the position in August 2014).  And, even if this action "could lead a reasonable juror to find that [Wiegmann] harbored a discriminatory attitude toward . . . employees [with accents]," Morris, 825 F.3d at 670, the plaintiff has not proffered any evidence to show Wiegmann's influence in the 2014 non-selection was motivated by national origin discriminatory bias, see id. (holding that the plaintiff "must show more than a general bias against . . . employees [with accents]; []he must also introduce enough evidence for a reasonable jury to find that [his non-selection] was motivated by that bias").  In addition, as the Court already noted, Clark stated that she would not have interviewed the plaintiff for the position in light of her knowledge of the plaintiff's experience, his résumé, and the skills that she was looking for in a candidate for that position.  See supra Part III.B.1 n.2.  Thus, this comment does not raise an inference of discriminatory animus.

In sum, because of the significant lapse in time between when the allegedly disparaging comments were made and the plaintiff's two non-selections, the Court finds that these comments

cited by the plaintiff do not have a relationship with or nexus between the plaintiff's two non-selections, the "relevant [adverse] employment decision[s]." Morris, 825 F.3d at 669. Therefore, without more, these comments qualify as stray remarks that are insufficient alone to permit a reasonable jury to infer that the plaintiff's two non-selections were motivated by discriminatory animus.

### b. Evidence of Inherently Unfair Interview Process

The plaintiff also asserts that "a jury could conclude that [his] failure to attain the top score [in the interviews] was the result of Clark and Wiegmann's discriminatory . . . manipulation [of the interview processes], which made it impossible for [him] to prevail, despite his qualifications." Pl.'s Opp'n at 21. Specifically, the plaintiff contends that "the selection process[es] relied entirely on a system that was designed by Clark, and the interview process and the scores given to the candidates by the other panelists were heavily influenced by Clark and Wiegmann—both of whom had exhibited discrimination against [him] in the past." Id. at 23. Relying on Salazar v. Washington Metropolitan Area Transit Authority, 401 F.3d 504 (D.C. Cir. 2005), and Perry v. Shinseki, 783 F. Supp. 2d 125, 139 (D.D.C. 2011), aff'd, 466 F. App'x 11 (D.C. Cir. 2012), the plaintiff provides several reasons why the interview processes were inherently unfair to him, which can be categorized as challenges based on (1) the selection of interview panelists and the improper influence of their scoring of candidates, (2) the questions and form of the interview processes, and (3) the unfairly scoring of the plaintiff. See id. at 21–42.

### i. The Plaintiff's Reliance on Salazar and Perry

Before addressing these separate challenges, the Court must first address the plaintiff's reliance on Salazar and Perry. In Salazar, the plaintiff, "a Peruvian-born Latino" who alleged

discrimination and retaliation regarding five promotion denials for entry-level supervisory positions, see 401 F.3d at 506–07, challenged "the specific process used by WMATA in selecting a candidate," id. at 508 (emphasis in original). In particular, the plaintiff alleged that, prior to the fifth promotion application process, "he [had] contacted . . . the Deputy General Manager at Metro, and asked him to ensure that . . . the Superintendent for Plant Equipment Maintenance[] would not select the members of the interview panel" because the Superintendent "discriminated against Latinos." Id. at 506. In response, the Deputy General Manager indicated that he would select the three panelists. See id. In reversing the district court's grant of summary judgment in favor of WMATA, the Circuit held that, "[al]though it [was] a close call, . . . a reasonable jury could find pretextual WMATA's assertion that it employed a fairly administered selection process with regards to the Metro Center Job." Id. at 509. The Circuit reached this conclusion because the Deputy General Manager "promised [the plaintiff] a panel that [the Superintendent] would have no hand in selecting. Yet [the Superintendent] ended up appointing [his assistant and close friend] as the panel's chair and even helped determine the weights of the questions." Id. at 508. Thus, the Court reasoned that "[t]he jury could base this determination on [the Superintendent's] unexplained participation—despite [the Deputy General Manager's] assurances—that in turn led to the appointment of [the Superintendent's assistant and close friend] and the development of the interview agenda, including the weights of the questions." Id. at 509; see also id. (noting that "a jury could infer something 'fishy' from the fact that [the official] placed himself squarely at the center of a[n] [interview] process designed to exclude him").

In Perry, the plaintiff alleged that her employer discriminated against her on the basis of her race and age when her employer failed to select her for a supervisory position and instead

selected a candidate whom the plaintiff believed was less qualified.  See 783 F. Supp. 2d at 128–

32.  Regarding the selection process, the plaintiff "suggest[ed] that the [defendant's] explanation

[was] pretext because" the officials who selected the interview panelists "'steer[ed] the position'

to [the chosen candidate] by means of a 'fishy' selection process."  Id. at 138 (fourth alteration in

original) (citation omitted).  In granting summary judgment for the defendant, another member

of this Court held that the plaintiff had failed to "present evidence that the changes in procedure

were inherently discriminatory," and therefore, "no reasonable jury could infer that the process

was so 'inherently suspicious' as to raise an inference of discrimination."  Id. at 139–40 (mainly

relying on Salazar as support for its conclusion that the plaintiff did not produce sufficient

evidence).

        The Court finds that the facts in this case are distinguishable from the facts in Salazar.

First, the ruling in Salazar, which the Circuit noted was a "close call," 401 F.3d at 509, "turned

on [the] fact . . . [that] the plaintiff in Salazar had been promised 'a panel that [a particular

supervisor] would have no hand in selecting.'"  Bailey v. Wash. Metro. Area Transit Auth., 810

F. Supp. 2d 295, 308 (D.D.C. 2011) (emphasis added) (third alteration in original) (quoting

Salazar, 401 F.3d at 508).  Thus, that was a situation where the employer "deviated from its

normal appointment process in response to [the plaintiff]'s concerns."  Salazar, 401 F.3d at 508.

Although, like in Salazar, the plaintiff in this case alleges that Wiegmann and Clark, who was the

selecting official, had discriminated against him in the past, see generally Compl., unlike in

Salazar, the plaintiff has not alleged or presented any evidence indicating that he was promised

that Clark or Wiegmann "would have no hand in selecting" the interview panelists, 401 F.3d at

508.

        Furthermore, contrary to the plaintiff's contention, Perry offers less support for the

plaintiff's allegations that the interview processes were unfair, raising inferences of discrimination. See Pl.'s Opp'n at 23 (arguing that "[a]lthough the [d]istrict [c]ourt in Perry granted summary judgment [in favor of the employer], in this case each of the factors that helped the employer in Perry, favor and support [his] claims"). Relying on Perry, the plaintiff asserts that "Wiegmann and Clark were 'squarely at the center' of both of the selection processes, and unfairly manipulated the selection to [his] distinct disadvantage, and their conduct otherwise raises question [about] the inherent credibility of the process." Id. But, in Perry, the court's full statement was that there was "no indication that [the selecting official] 'placed h[er]self squarely at the center of a process designed to exclude [her].'" 783 F. Supp. 2d at 139 (second and third alterations in original) (quoting Salazar, 401 F.3d at 509). Thus, the court in Perry recognized the distinction the Salazar court made, that being, the selecting official who had been previously accused of discrimination intentionally intervened in the interview process, even though the interview process was specifically designed to exclude them. See Perry, 783 F. Supp. 2d at 139 (citing Salazar, 401 F.3d at 509). Accordingly, the Court does not find the circumstances in either Salazar and in Perry comparable to the circumstances in this case.

### ii. The Selection and Alleged Improper Influence of Interview Panelists

The plaintiff contends that a "jury could conclude that Clark chose the interview panelists in an effort to avoid selecting [the plaintiff] and candidates from different national origins or who spoke with noticeable foreign accents." Pl.'s Opp'n at 26. Specifically, the plaintiff argues that "Clark included people who would naturally avoid hiring [the plaintiff] or who[m] she could control and influence." Id. at 24. The Court disagrees.

For the plaintiff's first non-selection in 2014, the panelists included Clark, Wiegmann, Hernandez, and Rosario. See id. at 24. The plaintiff asserts that the inclusion of Wiegmann and

Hernandez as panelists "hurt" his chances of being selected because they had previously made derogatory comments about him and others who spoke with accents. Id. But, as the Court previously discussed, the approximately two-year gap in time between when the derogatory comments were allegedly made and the plaintiff's non-selection in 2014 preclude any inference that this non-selection was motivated by discriminatory animus. See supra Part III.B.1.a. Moreover, Rosario is a member of the plaintiff's protected class, as he speaks English as a second language and speaks with an accent. See Def.'s Mot., Ex. 21 (Rosario Dep.) at 22:15–23:5, 131:10–12; see also 29 C.F.R. § 1606.1 ("The [EEOC] defines national origin discrimination broadly as including, but not limited to, the denial of equal employment opportunity because of an individual's, or his or her ancestor's, place of origin; or because an individual has the physical, cultural or linguistic characteristics of a national origin group."). More importantly, the candidate selected, Tseng, is a member of the plaintiff's protected class because he is an individual of foreign national origin and who speaks with a noticeable accent. See Def.'s Mem. at 1. Thus, Tseng's selection weighs strongly against an inference that Clark was motivated by any discriminatory animus. See Murray v. Gilmore, 406 F.3d 708, 715 (D.C. Cir. 2005) (noting that "a [selection] within the same protected class cuts strongly against any inference of discrimination"); see also Almutairi v. Int'l Broad. Bureau, 928 F. Supp. 2d 219, 233 (D.D.C. 2012) ("The failure-to-hire context seems particularly unlikely to yield a situation where an employer rejects a person on a prohibited basis, yet hires someone else from the same protected class. If an employer rejects someone because he has dark skin or because he is not Lebanese, it is hard to imagine the employer simultaneously filling the spot with someone else with those some scorned characteristics."). Thus, the Court does not find this argument by the plaintiff persuasive.

In addition, the plaintiff contends that "Clark testified . . . that she chose Rosario and Hernandez specifically because neither of them had relevant [i]nformation [t]echnology knowledge or experience," which a jury could conclude was "because they could be easily influenced in how they scored the candidates." Pl.'s Opp'n at 24. The plaintiff also claims that Wiegmann "duped these non-technical panelists into believing that [the plaintiff's responses] to technical questions were not accurate or good." Id. at 30 (asserting that Rosario and Hernandez asked for clarification on the quality of technical responses and that they gave him identical or similar scores for the two technical questions as Wiegmann and Clark gave). But, Clark was required only to select a panel that was comprised of "at least two subject matter experts and/or stakeholders who are knowledgeable of the position to be filled." See Def.'s Mot., Ex. 19 (Career Staffing Plan) ¶ 20.10.2. Although neither Hernandez nor Rosario had a background in information technology, they were knowledgeable about the position the plaintiff sought because they were "customers" of the Department. See Pl.'s Opp'n, Ex. 2 (Clark Dep.) at 145:7–146:12. And, contrary to the plaintiff's position, see Pl.'s Opp'n at 30, the record indicates that the panelists gave their scores prior to the panel's discussions regarding the quality of the candidate's technical responses, see Pl.'s Opp'n, Ex. 2 (Clark Dep.) at 159:15–160:2 (commenting that she wanted the discussion to occur after the collection of the scores so that "the scores [would not] be influenced by the discussion"); see also id., Ex. 1 (Wiegmann's Dep.) at 159:3–4 (stating that "everybody did their scores before the discussions ensued"); Pl.'s Facts ¶¶ 121–23. Thus, based on the record before it, the Court is not convinced that the plaintiff's speculative allegations of purported collusion raise an inference of discrimination.[4]

---

[4] The Court's reasoning here is also applicable to the plaintiff's claims that "Kotting and Hernandez were open to influence by Clark" in regards to his 2015 non-selection, given their lack of information technology background and ability to "understand some of the technical questions." Pl.'s Opp'n at 31.

Regarding his non-selection in 2015, the panelists for the first round of interviews were Clark, Hernandez, Billy Louis, Marino, and Gus Kotting. Pl.'s Opp'n at 24. The plaintiff lodges different claims as to why each of these panelists should not have been included. See id. at 24–26. In regards to Hernandez and Clark, the plaintiff asserts that including Hernandez "was unfair to [him] because she had already turned him down once for the position and . . . could be expected to do the same again," id. at 24, and that Clark's participation in both rounds of the interview "eliminated the benefit of having an independent panel consider the first pool of candidates," id. at 26. But, the plaintiff cites no factual or legal authority or even an Architect policy that precludes the participation of a panelist from a prior interview process or the selecting official, see id. at 24–26, and the Court sees no reason why such individuals would need to be precluded, particularly given that they collectively selected a candidate from the plaintiff's protected class prior to the interview for the position in 2015.

Moreover, the plaintiff contends that Kotting "was not eligible to interview candidates for a GS-14 position" because he was a GS-13 employee, and because of his selection as a member of the panel for the first round of interviews, a jury could "conclude that Clark wanted Kotting on the panel because he worked closely with . . . Rosario, who had been a panelist on the first selection" panel. See id. at 25. The plaintiff also argues that Marino was inappropriate to include on this panel because she was aware of his reassignment and his complaint against Clark and Wiegmann for discrimination. See id. at 25–26. Additionally, the plaintiff claims that "Clark included Louis as a panelist because she believed that Louis would not be inclined to select [him]," as "Louis[, who was (and remains) [the plaintiff's] supervisor, . . . [had] issued [the plaintiff a] . . . 'counseling memo[randum].'" Id. at 25. However, even accepting the plaintiff's allegations as true, he has failed to provide any evidence of how Kotting, Marino, or

Louis would be inclined not to select him for the position because he spoke with an accent.[5]

Accordingly, the Court does not find that this proffered evidence permits a reasonable jury to

infer that the plaintiff's non-selections were motivated by discriminatory animus.[6]

### iii.  The Questions Asked During the Interview Processes

The plaintiff argues that Clark unfairly designed the interview processes for both

non-selections to include questions that disadvantaged him.  See Pl.'s Opp'n at 26–30.

Specifically, the plaintiff contends that Clark excluded questions that would have elicited

"aspect[s] of the position[s] that played to his strengths," id. at 26 (asserting that Clark did not

include questions on "overseeing the [Department's] Help Desk, inventory management[,] and

[information technology] asset management," which she stated were "the primary duties for the

[interviewed] position"), and "included questions that . . . she knew would work to his

detriment," id. at 27 (including a question about how the candidates kept their information

technology skills updated, even though she purportedly denied the plaintiff's recent request for

---

[5] The plaintiff misconstrues the evidence in the record that allegedly supports his position with respect to Louis.  For instance, the plaintiff claims that Clark "denied any involvement with the counseling memorandum," Pl.'s Facts ¶ 75, and therefore, she allegedly "misrepresented her involvement in the [c]ounseling [m]emorandum (to hide her unlawful animus toward [the plaintiff]).  See Pl.'s Opp'n at 25.  However, Clark stated that she did not remember if Louis had issued the counseling memorandum, that she did not recall seeing the memorandum, and that she was not involved in drafting the memorandum.  See id., Ex. 2 (Clark's Dep.) 249–50.  Thus, contrary to the plaintiff's contention, see id. at 25, Louis's testimony is consistent with Clark's because he testified that Clark had no involvement with drafting the counseling memorandum, that Clark was part of a discussion prior to the issuance of the memorandum, and that the outcome of the discussion was to proceed with issuing the memorandum.  See id., Ex. 15 (Louis's Dep.) at 69:2–70:1, 75:5–22 (noting that Clark was not involved in the issuance of the memorandum).

[6] In a last yet unsuccessful attempt, the plaintiff contends that there are issues of material fact for a jury to decide.  See Pl.'s Opp'n at 32.  For his non-selection in 2015, the plaintiff claims that there is conflicting testimony as to whether there was a pre-interview meeting to determine a "consensus" on what the panel was looking for in the candidates' answers.  Id.  The plaintiff also claims that there is conflicting testimony on whether the panelists had a discussion before the scores were submitted.  Id.  The Court notes that the plaintiff's arguments here conflict with his statement of facts, which does not support his propositions.  Compare Pl.'s Opp'n at 32, with Pl.'s Facts ¶¶ 160–64 (citing deposition testimony).  In any event, the Court does not find these contentions sufficient to defeat summary judgment, as the plaintiff has not proffered evidence that these actions constitute discrimination on the basis of his national origin.

such training).[7]  The plaintiff also claims that Clark asked subjective questions without any

guiding factors, see id. at 28, and that she included a two minute "elevator-speech" question that

"disadvantaged people who spoke with strong accents," id. at 29.

The plaintiff's allegations regarding the questions asked during the interview processes

would not permit a jury to reasonably infer that his non-selections were motivated by national

origin discriminatory animus.  See Paulk v. Architect of the Capitol, 79 F. Supp. 3d 82, 87

(D.D.C. 2015) ("[C]harges of unfairness, no matter how well-founded, do not by themselves

prove unlawful discrimination.").  There is no dispute that each of the candidates interviewed

was interviewed by the same panelists and was asked the same questions, see generally Pl.'s

Opp'n (not challenging these facts), and thus, each candidate was provided the same opportunity

to highlight his or her professional strengths.[8]  See Bell v. Donley, 928 F. Supp. 2d 174, (D.D.C.

2013) ("[A]ll of the candidates . . . were subjected to the same interview process and ratings

formula, which refutes any notion of unique 'irregularity' in connection with  . . . [the] interview

process [warranting an inference of discrimination].").  In addition, there is nothing inherently

discriminatory about the two-minute "elevator-speech" question used to test the candidate's

ability to communicate.  See Pl.'s Opp'n, Ex. 15 (Louis Dep.) 154:3–8 (stating that the

---

[7] Opposite to what the plaintiff claims, see Pl.'s Opp'n at 27, the record indicates that this request for informational technology training was denied over two months after Clark posed the skills-related question during the plaintiff's interview in 2014, compare Def.'s Mot., Ex. 37 (Plaintiff's Response to Defendant's Second Set of Interrogatories and Second Set of Requests For the Production of Documents) at 7 (noting that the request was denied on August 26, 2014), with id., Ex. 22 (Collection of interview notes for the plaintiff) at 2 (noting that the plaintiff's interview was on June 16, 2014), and over a year before the plaintiff's interview in 2015, compare Def.'s Mot., Ex. 37 (Plaintiff's Response to Defendant's Second Set of Interrogatories and Second Set of Requests For the Production of Documents) at 7, with id., Ex. 33 (Collection of interview notes for the plaintiff) at 2 (noting that the plaintiff's interview was on November 30, 2015).

[8] The plaintiff argues that "Clark did not regularly ask the question about [information technology] skills in this way." Pl.'s Opp'n at 27 (arguing that Clark knew that the information technology skills questions were posed awkwardly so that it would disadvantage the plaintiff).  However, this argument is a red herring and undoubtedly without merit, as the plaintiff cites an information technology skills question posed in an interview for an entirely different position.  See id.  The plaintiff points to no legal or factual authority that requires an employer to ask the same question in every interview for each position that it seeks to fill.

elevator-speech question was designed "to show whether the [candidate] is poised; ability to think on their feet. Articulation is part of that; you know, being able to express themselves in a concise way and have the ability to showcase their knowledge, skills, and ability"). And, as the Architect notes, candidates who spoke with an accent, like the plaintiff, actually scored well on this question. See Def.'s Reply at 20 (discussing scores on the elevator-speech question given to other candidates who spoke with an accent). Thus, "absent [some] demonstrably discriminatory motive," which the plaintiff has not presented evidence to support regarding these allegations of unfairness, the Court declines to "second-guess" the Architect's selection of the questions posed to the candidates. Fischbach v. D.C. Dep't of Corr., 86 F.3d 1180, 1183 (D.D.C. 1996).

Moreover, "[t]he use of subjective questions during an interview . . . does not alone establish a pretext." Brown v. Small, No. 05-1086 (RMU), 2007 WL 158719, *7 n.3 (D.D.C. Jan. 19, 2007) ("Absent any additional [credible] evidence or argument of a discriminatory motive, the court declines to make the inferential leap required to conclude that the panel utilized subjective scoring to intentionally discriminate against the plaintiff."). And, even though "an employer's heavy use of 'highly subjective' criteria . . . could support an inference of discrimination," that inference generally develops in cases where "the plaintiff was otherwise significantly better qualified than the successful applicant." Aka, 156 F.3d at 1298 ("[A]lthough employers may of course take subjective considerations into account in their employment decisions, courts traditionally treat explanations that rely heavily on subjective considerations with caution. Particularly in cases where a jury could reasonably find that the plaintiff was otherwise significantly better qualified than the successful applicant, an employer's asserted strong reliance on subjective feelings about the candidates may mask discrimination."). Again, the plaintiff does not contend that he was significantly more qualified than the selectees, see Pl.'s

Opp'n at 21 n.5, nor has he cited "any evidence suggesting that [Clark] relied upon any highly subjective criterion, such as 'interpersonal skills,'" Fischbach, 86 F.3d at 1184. Accordingly, a reasonable jury could not find that the questions used during the interview processes raise an inference of discrimination against the plaintiff.

### iv. The Alleged Unfair Scoring of the Plaintiff

Additionally, the plaintiff argues that he received unfair scores in both of the application processes, which, according to him, demonstrates that the Architect's qualifications-based explanation is pretextual. See Pl.'s Opp'n at 32–40. In his attempt to demonstrate that the Court must find that an inference of discrimination for his non-selections exist, the plaintiff dives into comparisons of the scores he received on various questions posed during both interview processes, subjectively asserting that he should have received higher scores because he gave better responses. See id. at 33–40 (reconstructing the panelists' notes on the candidates' responses during the interviews). For the reasons provided below, the Court does not find that these comparisons create an inference from which a reasonable jury could conclude that the plaintiff was not selected for the positions on either occasion because of his national origin.

For the purpose of determining whether the Architect's qualifications-based explanation is pretextual, "it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." Hairston v. Vance-Cooks, 773 F.3d 266, 273 (D.C. Cir. 2014) (quoting Vatel v. All. of Auto. Mfrs., 627 F.3d 1245, 1247 (D.C. Cir. 2011)). Consequently, the "plaintiff's personal evaluation of his own . . . performance is insufficient to rebut [the Architect's] legitimate, non-discriminatory reason for his non-selection[s]." Ficken v. Clinton, 771 F. Supp. 2d 79, 84 (D.D.C. 2011) (citing cases). Even so, as the Architect notes, see Def.'s Reply at 21, the plaintiff's subjective analysis primarily compares his responses and the corresponding scores

he received for those responses with the responses and corresponding scores received by the candidates who were not selected for either of the positions in 2014 or 2015, see Pl.'s Opp'n at 33–40. Such evidence can hardly be said to be helpful in assisting the Court in determining whether a reasonable jury could find that the Architect's legitimate, non-discriminatory reason for the plaintiff's non-selections—that the candidates that were selected were the most qualified— is pretext for masking discrimination.

Furthermore, regarding the portion of the plaintiff's analysis comparing his responses and scores to the candidates that were selected, the Court reiterates that the plaintiff does not challenge that he was more qualified than the individuals selected. See Pl.'s Opp'n at 21 n.5. Also, the Court reemphasizes that the candidate selected for the 2014 position and one of the candidates who advanced to the second round for the 2015 position were members of the plaintiff's protected class (individuals who spoke with a foreign accent), minimizing any inference that the plaintiff was unlawfully discriminated against based on his national origin. Murray, 406 F.3d at 715 ("[A selectee] within the same protected class cuts strongly against any inference of discrimination."). Nonetheless, the plaintiff contends that he should have received scores either equal to or higher than the scores given to the candidates selected for the positions. See Pl.'s Opp'n at 33–40. But, unless a "demonstrably discriminatory motive" is apparent, which is not the case here, "[t]he Court 'must respect the employer's unfettered discretion to choose among qualified candidates." Adeyemi v. District of Columbia, No. 04-1684 (CKK), 2007 WL 1020754, at *21 (D.D.C. Mar. 31, 2007) (first quoting Milton v. Weinberger, 696 F.2d 94, 100 (D.C. Cir. 1982), then quoting Fischbach, 86 F.3d at 1183), aff'd, 525 F.3d 1222 (D.C. Cir. 2008). Accordingly, the Court does not find the plaintiff's subjective allegations that he was unfairly scored sufficient to create an inference that the Architect's

qualifications-based explanation is pretextual.

<h3>c. The Plaintiff's Contention that the Architect Selected or Advanced Candidates in a Ploy to Disguise Discriminatory Animus</h3>

The plaintiff also alleges that the hiring of Tseng in 2014 was a ploy to conceal Clark's and Wiegmann's discriminatory animus.  See Pl.'s Opp'n at 41–44.  In particular, the plaintiff asserts that "a jury could conclude that Clark selected . . . Tseng knowing that she would terminate him and then fill the position with someone who did not speak with an accent, which is ultimately what occurred."  Id. at 42.  As support for his position, the plaintiff argues that Tseng's interview indicated that he had a "passive management style," id. (asserting this conclusion because Tseng "gave a bad response to the question about managing contractors and in-house staff" and because Tseng "was willing to 'take crap' from people"), and "lacked expertise in Microsoft systems," id. (making this assessment because Tseng did not provide an example of a successful Microsoft deployment).  Additionally, the plaintiff asserts that "Clark began the process of terminating . . . Tseng shortly after hiring him."  Id.; see also id. at 42–43 (noting that Tseng started on October 20, 2014, that Clark's first documentation of Tseng's poor performance was in early January 2015, and that Clark proposed to Human Resources Tseng's termination on July 30, 2015, which she allegedly "attempted to conceal").

Regarding his non-selection in 2015, the plaintiff contends that

> [a] jury could further conclude that, when it became clear that A.M. ([another candidate] who was Hispanic and spoke with an accent) might have been the selectee based on the results from the interview panel, Clark devised to use a second round of interviews[] that . . . was used to eliminate A.M. because of his accent.

Id. at 40.  Particularly, the plaintiff asserts that "Clark knew that . . . the highest scoring candidate from the first round of interviews . . . would not ultimately accept the . . . position because it was a demotion [for him]," and that "Clark [knowing that] A.M., the next highest

scoring candidate from the first round, would have been the selectee," she announced that there would be a second round of interviews. Id.

The Court finds these allegations by the plaintiff entirely speculative and hardly capable of raising any inference of discrimination, let alone a discriminatory animus that motivated the plaintiff's non-selections. See Glass v. Lahood, 786 F. Supp. 2d 189, 219 (D.D.C. 2011) (holding that inferences of discrimination the plaintiff sought to draw from her allegations were "so vague and conclusory, and so far removed from the actual employment decision that [was] being challenged, that a reasonable fact-finder could not draw even the weakest inference of discrimination from [those] events."). Concerning the selection of Tseng and his responses during his interview, the plaintiff misses the mark, as the relevant inquiry is not whether a reasonable jury can find pretext because the selected candidate failed to provide perfect answers in his or her interview; rather, the relevant inquiry is whether "a reasonable employer would have found the plaintiff to be significantly better qualified for the job." Aka, 156 F.3d at 1294. And, an "employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria." Tex. Dep't. of Cmty. Affairs v. Burdine, 450 U.S. 248, 259 (1981). As the Architect notes, "each and every interview panelist (including . . . Clark) ranked . . . Tseng as the most qualified candidate," Def.'s Reply at 2; see Def.'s Mot., Ex. 24 (Collection of panelists' scores for Tseng), and, as the Court previously stated, this is a fact that the plaintiff does not challenge, see supra Part III.B.1.

In addition, the plaintiff's contentions that Clark began the process of terminating Tseng shortly after he assumed the position and that Clark instituted a second round of interviews to avoid selecting A.M. in 2015 do not raise an inference of discrimination regarding the plaintiff's two non-selections, which are the challenged adverse employment actions in this case. In any

event, the plaintiff misrepresents the record concerning the factual circumstances surrounding these events. For instance, although the plaintiff alleges that "Clark attempted to conceal the fact that she proposed Tseng's [termination]," Pl.'s Opp'n at 43, the record shows that she never actually filed a proposal before Tseng resigned, but only shows that she had intended to make that recommendation, see Pl.'s Opp'n, Ex. 97 (Collection of emails and documents filed under seal) at AOC002035 (informing Human Resources of her intent to terminate Tseng but indicating that she was awaiting approval before starting the process); see Pl.'s Opp'n, Ex. 2 (Clark Dep.) at 212:8–9 (stating that she was preparing to, but never submitted any proposal). Additionally, the plaintiff claims that the announcement of the second round of interviews came after the conclusion of the first round; however, Clark testified that she explained to the first round panelists that there would be a second round of interviews for the top three candidates "[i]n the very beginning before the interview process started." Pl.'s Opp'n, Ex. 2 (Clark Dep.) at 219:7–18. And, all of the other panelists for the first round could not remember or were unsure of when Clark informed them that this interview process would consist of more than one round. See Pl.'s Facts ¶ 173; see also Pl.'s Opp'n, Ex. 15 (Louis Dep.) at 122:7–123:10 (stating that he does not "think [they] discussed [there being more than one round at the time the process was explained] really," and that he "believe[s] it was after all the candidates were interviewed" because "some of the candidates were very close in scores"). But, even accepting the plaintiff's allegation as true that the announcement of a second round of interviews occurred after the conclusion of the first round, the "narrowing [of] the pool of candidates through the use of a preliminary round of interviews hardly suggests a discriminatory motive." Glenn v. Bair, 643 F. Supp. 2d 23, 41 (D.D.C. 2009).

Simply, all of these allegations rely too heavily on the plaintiff's own subjective

interpretation of the record, and more importantly, are too speculative to raise a reasonable inference of discriminatory animus on the basis of national origin against the plaintiff in regards to his non-selections. Accordingly, the Court does not find that a reasonable jury could find that these allegations raise an inference of discrimination sufficient to show that the Architect's qualifications-based explanation is pretextual.

### d. The Plaintiff's Allegations of Adverse Inferences That Should Be Construed in His Favor

Despite the lack of evidence demonstrating a genuine inference of discrimination, the plaintiff claims that he is entitled to adverse inferences "consistent with [his] evidence of pretext," Pl.'s Opp'n at 45, because "the [Architect] has destroyed or withheld (1) the scoring matrix from the first selection . . . [,] (2) the [draft] vacancy announcement from the second selection . . . [,] and (3) the justification memorandum from the second selection," id. at 44. According to the plaintiff, "the matrix and justification memorandum would have provided the panel's contemporaneous assessment of the candidates and justification for the selection, and . . . the original vacancy announcement from the second selection would show whether Clark was responsible for requiring candidates to supply their diplomas, transcripts, and or equivalency certifications." Id. at 44–45. In response, the Architect argues that the plaintiff "cannot show that all of the documents he claims have been destroyed actually existed or that [it] in fact destroyed them." Def.'s Reply at 22.

Although, "[t]his Circuit has recognized negative evidentiary inferences arising from the negligent spoliation of potentially relevant" documents, Paulk, 79 F. Supp. 3d at 90 (citing Gerlich v. U.S. Dep't of Justice, 711 F.3d 161, 171 (D.C. Cir. 2013) (finding a duty to preserve where future litigation was "reasonably foreseeable"); Talavera v. Shah, 638 F.3d 303, 311–12 (D.C. Cir. 2011) (allowing an adverse inference when negligent document destruction

violated an EEOC regulation)), the record weighs in favor of rejecting altogether the adverse inferences the plaintiff seeks.[9]  The Court reaches this conclusion because it does not find these documents relevant to the plaintiff's showing of pretext.

The plaintiff proposes the following inferences: (1) in regards to the 2014 scoring matrix — "that the matrix did not exist and Clark fabricated her account that the discussion about the candidates occurred after the scores had been recorded, or that the scoring matrix showed that [he] was scored unfairly"; (2) in regards to the draft vacancy announcement — "Clark required candidates to include their transcripts as a hurdle for [the plaintiff] to overcome"; and (3) in regards to the justification memorandum — "there was some mention of avoiding candidates who spoke with accents and/or that [he] had the qualifications required by the position."  Pl.'s Opp'n at 45.  As another member of this Court recognized, the "inference[s] of the magnitude [the] plaintiff proposes would translate to [a] directed verdict in his favor, notwithstanding clear evidence that" the Architect selected the most qualified candidates, Paulk, 79 F. Supp. 3d at 90, a fact that the Court again notes the plaintiff does not dispute, see Pl.'s Opp'n at 21 n.5.

In any event, although the plaintiff alternatively speculates that a scoring matrix for the first selection still exists or did exist, see Pl.'s Facts ¶ 125 (failing to provide support for the existence of the scoring matrix), the plaintiff did "receive[] [the] individual scoring sheets showing the scores awarded to each of the applicants," Def.'s Reply at 22.  In addition, even though Clark testified that no changes were made to the draft that provided the basis for the final vacancy announcement, see Pl.'s Opp'n, Ex. 2 (Clark Dep.) at 204:1–205:12 (noting that she did

<hr/>

[9] "[T]he Circuit's law on spoliation, for the '[d]estruction of notes or other documents purportedly relevant to a case of discrimination has no effect . . . except when the circumstances of destruction provide[ ] a basis for attributing bad faith to the agency involved.'"  McIntyre v. Peters, 460 F. Supp. 2d 125, 138 (D.D.C. 2006) (alterations and omission in original) (quoting Coleman v. Casey, No. 84-3071, 1986 WL 11744, at *5 (D.D.C. June 19, 1986)).  The Court notes that here the plaintiff "has not made . . . such a showing of bad faith regarding the [alleged] destruction, and thus no adverse inference is mandated based on the spoliation doctrine."  Id.

not request the inclusion of language requiring candidates to provide proof of their transcripts and that she did not make any changes to the draft vacancy announcement before it became finalized), the requirement to provide proof of the applicants' transcripts was applicable to each of the applicants, not just the plaintiff, see Pl.'s Opp'n at 8 (acknowledging that this requirement applied to other "foreign educated applicants"); see also Def.'s Mot., Ex. 17 (Cortez Dep.) at 31:8–33:1 (noting that its policy to ensure that all GS-14 applicants, such as the plaintiff, have a Bachelor's degree by requesting proof of a transcript or a diploma).  Finally, regarding the alleged justification memorandum for the 2015 selection, Clark testified that she had "notes [to] explain why the selection was made [and] the factors that were considered" at a debriefing for the internal candidates.  Pl.'s Opp'n, Ex. 2 (Clark's Dep.) 246:5–247:1.  And, contrary to the plaintiff's speculation, it would be entirely unreasonable for those notes to indicate that the panel should avoid candidates who spoke with accents, given that the record reflects that one of the top three candidates selected for a second interview spoke with an accent.  Also, concerning the alternative inference that the plaintiff was qualified for the job, again the plaintiff misses the mark, which is not whether he was qualified, but whether he was substantially more qualified than the candidate selected.  Therefore, the Court does not find that the plaintiff is entitled to any adverse inferences stemming from these allegedly destroyed or withheld documents.

At bottom, upon review of the record, the Court does not find that the circumstantial evidence offered by the plaintiff is sufficient to raise a reasonable inference that the plaintiff was discriminated against based on his national origin when the Architect failed to select him for the position in 2014 or in 2015.  Accordingly, because a reasonable jury could not find that the plaintiff has demonstrated through circumstantial evidence that the Architect's qualifications-based explanation for his non-selections is pretext for masking discrimination, the

Court must grant the Architect's motion for summary judgment on the plaintiff's discrimination claim.

## 2. Retaliation

"Title VII's anti-retaliation provision 'forbids employer actions that discriminate against an employee (or job applicant) because [he] has opposed a practice that Title VII forbids." Young v. Covington & Burling L.L.P., 846 F. Supp. 2d 141, 164 (D.D.C. 2012) (Walton, J.) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 59 (2006)). In the absence of direct evidence of retaliation, "[c]laims of retaliation under Title VII are governed by the same McDonnell-Douglas burden-shifting analysis applicable to discrimination claims." Mamantov v. McCarthy, 142 F. Supp. 3d 24, 32 (D.D.C. 2015) (Walton, J.).[10] As noted earlier, "[u]nder that framework, a plaintiff must first establish a prima facie case of retaliation by showing (1) that he engaged in a statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) that a causal link connects the two." Jones v. Bernanke, 557 F.3d 670, 677 (D.C. Cir. 2009) (emphasis added) (citing Wiley v. Glassman, 511 F.3d 151, 155 (D.C. Cir.

---

[10] To demonstrate the existence of direct evidence of retaliation, the plaintiff relies only on an e-mail sent by Dan Cassil, the Deputy Chief Administrative Officer and supervisor of Wiegmann and Clark, to his superiors in October 2012, wherein he explained "why [the plaintiff] had been removed from his Help Desk Manager position." Pl.'s Opp'n at 19. However, the plaintiff's reliance on this e-mail as direct evidence of retaliation is flawed for several reasons. Primarily, because Cassil sent the e-mail approximately five months before the plaintiff engaged in protected activity, see id. (stating that Cassil sent the aforementioned e-mail in October 2012); Compl. ¶ 27 (stating that the plaintiff filed a complaint with the Office of Compliance in February 2013), and Cassil was not a decision-maker in either of the two non-selections. Additionally, contrary to the plaintiff's assertion, the content of Cassil's e-mail does not reflect retaliatory animus or that the plaintiff was removed from his Help Desk position because of retaliation. See Pl.'s Opp'n at 19. Rather, Cassil explained that the basis for the plaintiff's removal was because the Department had no "need for a full-time federal helpdesk manager because that function [was] operated by [a] contractor." Id., Ex. 13 (e-mail sent from Cassil to Christine Merdon, among others, dated October 5, 2012 ("Cassil's E-mail")) at 1. And, Cassil noted that the plaintiff's reassignment would "allow [the Department] to better utilize [the plaintiff] to backfill th[e] critical IT Liaison vacancy, and eliminate [the plaintiff's] work-required contact with the co-worker" the plaintiff had a conflict with that resulted in the plaintiff "invok[ing] mediation." Id., Ex. 13 (Cassil's E-mail). Accordingly, the Court does not find that Cassil's e-mail is direct evidence of retaliation regarding the Architect's non-selection of the plaintiff in 2014 and in 2015. See Hampton v. Vilsack, 760 F. Supp. 2d 38, 49 (D.D.C. 2011) (defining direct evidence as "expressions by the decision maker that are evidence of discriminatory or retaliatory intent"); Lemmons v. Georgetown Univ. Hosp., 431 F. Supp. 2d 76, 86 (D.D.C. 2006) (Walton, J.) ("Direct evidence of discrimination is evidence that, if believed by the fact finder, proves the particular fact in question without any need for [any] inference[s].") (emphasis omitted).

2007).  However, just like a discrimination claim, once an employer produces a legitimate, non-retaliatory reason for the adverse action, "the burden-shifting framework disappears, and a court reviewing summary judgment looks to whether a reasonable jury could infer intentional . . . retaliation from all the evidence."  Carter v. George Wash. Univ., 387 F.3d 872, 878 (D.C. Cir. 2004).

The Court has already concluded that the Architect's stated reason for the plaintiff's non-selections in 2014 and in 2015, (i.e., that the candidates selected were more qualified than the plaintiff), qualifies as a legitimate, nondiscriminatory reason for the adverse actions challenged by the plaintiff.  Thus, similar to the earlier analysis of the plaintiff's national original discrimination claim, the Court must determine whether a reasonable jury could infer intentional retaliation from the evidence.  The plaintiff mainly argues that the "very close [temporal] proximity between [his] protected activity," the filing of his complaint with the OOC in 2013, and the Architect's two non-selections "creates a strong inference of retaliation" that suggests that the Architect's legitimate, non-retaliatory reason for the non-selections is pretextual.  Pl.'s Opp'n at 20.  The Court disagrees.

"Temporal proximity can indeed support an inference of causation, but only where the two events are very close in time."  Hamilton, 666 F.3d at 1357 (quoting Woodruff v. Peters, 482 F.3d 521, 529 (D.C. Cir. 2007)).  Therefore, adverse "action[s] that transpire[] more than three or four months after protected activity are less likely to create causal inferences."  Paulk, 79 F. Supp. 3d at 91 (citing Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273–74 (2001); see Roman v. Castro, 149 F. Supp. 3d 157, 173–74 (D.D.C. 2016) (finding that a reasonable jury could discern retaliation based on the combination of temporal proximity and a "budding pattern of antagonism" related to the plaintiff's prior protected activity).  Even where the plaintiff

sufficiently alleges close temporal proximity, "the fact that [the] employer['s] adverse action follows closely after an employee's protected assertion of rights is not, by itself, always enough to survive summary judgment." Allen v. Johnson, 795 F.3d 34, 47 (D.C. Cir. 2015). And, once an employer has offered a legitimate non-retaliatory reason for the challenged action, "positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine." Woodruff, 482 F.3d at 530.

The Court finds that the plaintiff has not met his burden of producing "sufficient evidence for a reasonable jury to infer" that retaliation was the actual motive for his non-selections by the Architect. Jones, 557 F.3d at 679 (citation omitted). First, with respect to his non-selection in 2014, the plaintiff contends that this decision "was made on August 13, 2014—only two weeks after" the Office of Compliance Board of Directors affirmed the hearing officer's finding that the Architect discriminated against him on the basis of his national origin by reassigning him from the Help Desk manager position. Pl.'s Opp'n at 20 ("The Board's decision, affirming [the hearing officer's] finding of discrimination and requiring the [Architect] to pay damages, was the culmination of [the p]laintiff's protected activity."). However, although the Office of Compliance Board of Directors' decision occurred within a month of the plaintiff's non-selection in 2014, see id., Ex. 21 (BOD Decision); see also id. (noting that Office of Compliance Board of Directors' decision came two weeks before the plaintiff's non-selection in 2014), it nonetheless fails to raise an inference of retaliation for several reasons. The Court reaches this conclusion primarily because the appeal to the Office of Compliance Board of Directors was undertaken by the Architect and not the plaintiff, see Def.'s Mem. at 33 n.5 (arguing that its filing of an appeal cannot constitute "protected activity activity under Title VII because it was not undertaken by [the plaintiff]"); see also Pl.'s Mem. at 20 (failing to rebut this argument by the Architect or to

37

indicate how the plaintiff meaningfully participated in the appeal process such that his participation could constitute protected activity); Clark Cty. Sch. Dist., 532 U.S. at 273 (holding that "an action in which an employee takes no part" (i.e., an Equal Employment Opportunity Commission's issuance of a right-to-sue letter) cannot be considered protected activity by the employee). But, even if this appeal could be considered as protected activity by the plaintiff, the record indicates that the plaintiff interviewed and the panelists scored his responses on June 16, 2014, see Def.'s Mot., Ex. 25 (Collection of scores for the plaintiff), approximately two months before the Office of Compliance Board of Directors issued its decision, see Pl.'s Opp'n at 20.[11] And the plaintiff has not alleged that his scores were unlawfully altered from when he was interviewed to when his non-selection was announced. See generally Compl.; Pl.'s Opp'n. Therefore, the timing of the appellate decision fails to raise an inference of retaliation.

Similarly, the plaintiff fares no better regarding his non-selection in 2015. As to this adverse action, the plaintiff argues that, "[he] propounded discovery on September 3, 2015, and the . . . vacancy [for the Branch Chief position] was opened three weeks later, on September 25, 2015," and therefore, "[t]here is [a] very close proximity between protected activity and the [Architect's] action." Pl.'s Opp'n at 20 (internal citation omitted). But, the opening of the vacancy for the Branch Chief position in 2015 is by no means an adverse employment action. See Holcomb, 433 F.3d at 902 (holding that adverse employment actions occur "when an employee 'experiences materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm'") (citation omitted). Rather, the adverse employment

---

[11] The Court notes that the cases relied on by the plaintiff for the proposition that ongoing litigation involving an employee's participation constitutes protected activity all involved plaintiffs who were actively seeking to settle their cases or seeking the relief that they had originally sought. See Pl.'s Opp'n at 20 (citing Singletary v. District of Columbia, 351 F.3d 519, 524 (D.C. Cir. 2003); Youssef v. Holder, 62 F. Supp. 3d 96, 100 (D.D.C. 2014)).

action was the plaintiff's non-selection for that position, see id. at 902 n.4 ("[A] plaintiff makes out an adverse employment action once []he has shown that []he has been 'aggrieved' by the action."), which, as the plaintiff acknowledges, did not occur until March 4, 2016, see Suppl. Compl. ¶ 20.

In sum, the plaintiff has failed to establish either through direct evidence or close temporal proximity retaliation against him for engaging in protected activity. Therefore, the Court must grant the Architect's motion for summary judgment with respect to the plaintiff's claim of retaliation.

## IV.    CONCLUSION

For the foregoing reasons, because the plaintiff has failed to identify a sufficient reason for oral argument or a new factual issue the Architect raised in its reply, the Court must deny the plaintiff's motion for oral argument or for leave to file a sur-reply. Additionally, the Court concludes that a reasonable jury could not find that the Architect's qualifications-based explanation for the plaintiff's two non-selections was pretext for discrimination or retaliation. Therefore, the Court must grant summary judgment in favor of the Architect with respect to both of the plaintiff's Title VII claims.

**SO ORDERED** this 25th day of October, 2017.[12]

REGGIE B. WALTON
United States District Judge

---

[12] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.